# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

**Rush University Medical Center v. Sessions, 2012 IL 112906**

---

| | |
|---|---|
| Caption in Supreme Court: | RUSH UNIVERSITY MEDICAL CENTER, Appellant, v. ROGER SESSIONS *et al.*, Trustees, Appellees (The People of the State of Illinois *ex rel.* Lisa Madigan, Attorney General, Intervening Appellant). |
| Docket Nos. | 112906, 112993 cons. |
| Filed | September 20, 2012 |
| Rehearing denied | November 26, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The common law rule that a self-settled spendthrift trust is void as to existing and future creditors is not abrogated by the Uniform Fraudulent Transfer Act embodied in the Illinois statutes, even though the common law rule treats as fraudulent what the Act considers nonfraudulent—plaintiff creditor allowed to reach trust assets. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Henry A. Budzinski and the Hon. James W. Kennedy, Judges, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed.<br>Cause remanded. |

| Counsel on Appeal | James R. Hellige, John T. Brooks, David B. Goroff and Erika A. Alley, of Foley & Lardner LLP, of Chicago, for appellant. |
| | |
| | Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of Chicago, of counsel), for intervenor-appellant. |
| | |
| | Edward T. Joyce and Jennifer L. Doherty, of Chicago, for appellees. |
| | |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Rush University Medical Center, filed a three-count complaint against defendants, the trustees of two trusts that were created by Robert W. Sessions. Plaintiff sought payment of $1.5 million from the trusts based on a philanthropic pledge that Sessions had made to plaintiff before he died. The third count of the complaint was based on the common law rule that a self-settled spendthrift trust is void as to existing and future creditors. The Attorney General of Illinois intervened in the dispute, taking the side of plaintiff. The circuit court of Cook County granted summary judgment in favor of plaintiff on count III, finding that the trust created by Sessions on February 1, 1994, was liable to pay plaintiff $1.5 million. The trustees appealed, and the appellate court reversed the order of summary judgment in favor of plaintiff on count III, ruling that the common law cause of action alleged therein was abrogated by the enactment of the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)). 2011 IL App (1st) 101136. Both plaintiff and the Attorney General filed petitions for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), which this court allowed and consolidated for review.

¶ 2                                        BACKGROUND
¶ 3    The undisputed facts in the pleadings, exhibits and affidavits on file establish the following. On February 1, 1994, Robert W. Sessions established the "Sessions Family Trust" and provided that it was to be governed by the law of the Cook Islands. When Sessions created this trust, he placed into it his 99% limited partnership interest in Sessions Family Partners, Ltd, a Colorado limited partnership, as well as property in Hinsdale, Illinois. At the time of his death, these assets were valued at more than $16.2 million and $2.7 million, respectively. Sessions was both the settlor and a lifetime beneficiary of the trust. It was

furthermore irrevocable, and it authorized the trustees to make distributions to Sessions of both income and principal for his "maintenance, support, education, comfort and well-being, pleasure, desire and happiness." The trust also named Sessions as the "Trust Protector," giving him the absolute power to appoint or remove trustees and to veto any of their discretionary actions. Sessions also had the power to appoint or change beneficiaries, by will or codicil, who would continue under the trust after his death. Finally, the trust contained a spendthrift provision that prohibited any trust assets from being used to pay creditors of Sessions or his estate.

¶ 4    Plaintiff is a charitable institution that operates a major teaching and research hospital in Chicago. In the fall of 1995, Sessions made an irrevocable pledge to plaintiff of $1.5 million for the construction of a new president's house on the plaintiff's university campus in Chicago. Sessions then executed successive codicils to his will, providing that any amount remaining unpaid on his $1.5 million pledge as of his death would be given to plaintiff on his death. On September 30, 1996, Sessions sent plaintiff another letter stating that his pledge was "made in order to induce [plaintiff] to construct a Rush University Presidential Residence." This second letter confirmed his earlier pledge as follows:

> "I agree to provide in my will, living trust and other estate planning document *** that (1) this pledge, if unfulfilled at the time of my death, shall be paid in cash upon my death as a debt and (2) that if this pledge is unenforceable for any reason, a cash distribution shall be made under such will, living trust or other document to [plaintiff] in an amount equal to the unpaid portion of such pledge at the time of my death."

Sessions also stated in this second letter that his pledge was binding upon his "estate, heirs, successors and assigns," except to the extent that he had paid the pledge before his death.

¶ 5    In reliance on Sessions' pledge, plaintiff constructed the president's house on its university campus in Chicago at a cost in excess of $1.5 million. The house has since been used as a residence for the president of the university and as a center for conferences and other university events. The plaintiff named the house the "Robert W. Sessions House" and held a public dedication honoring Sessions for his generosity. Sessions was present at the dedication and cut the ceremonial ribbon, and a plaque adorning the front of the house still bears his name. Sessions did not make any payments to plaintiff during his lifetime toward the $1.5 million pledge.

¶ 6    In February 2005, Sessions was diagnosed with late-stage lung cancer. He blamed plaintiff for not diagnosing the cancer sooner so that it could be treated. On March 10, 2005, about six weeks before he died, Sessions executed a new will revoking all previous wills and codicils. This new will made no provision for any payment to plaintiff toward his pledge. On April 19, 2005, six days before he died, Sessions created a second trust, the Robert W. Sessions Revocable Living Trust, and transferred to it his 1% general partnership interest in Sessions Family Partners, Ltd. This 1% interest was valued at $164,205. Shortly before his death, Sessions also made various gifts of about $200,000, which ostensibly reduced the eventual assets of his estate. Sessions died on April 25, 2005.

¶ 7    On December 15, 2005, plaintiff filed an amended claim, in the probate division of the

circuit court of Cook County, against Sessions' estate to enforce the $1.5 million pledge. The estate contested plaintiff's claim, and litigation ensued. The Sessions estate was found to contain less than $100,000. Thus, on April 4, 2006, in a supplemental proceeding, plaintiff filed a three-count[1] verified complaint against the trustees of the Sessions Family Trust that was created in 1994, seeking to reach the trust assets to satisfy the debt owed to plaintiff by Sessions. Thereafter, plaintiff moved for summary judgment against the estate on its claim in the original proceeding, and on August 31, 2006, the circuit court granted summary judgment in favor of plaintiff. The estate appealed, and the supplemental proceeding was stayed pending the outcome of the appeal. On December 3, 2007, the appellate court, in a summary order, affirmed the summary judgment in favor of plaintiff in the estate's appeal (*In re Estate of Sessions*, No. 1-07-0202 (2007) (unpublished order under Supreme Court Rule 23)).

¶ 8    The litigation then resumed in plaintiff's supplemental proceeding against the trustees. At some point, the Attorney General intervened in the dispute, filing a joinder in the plaintiff's pleadings.

¶ 9    Count III of plaintiff's complaint against the trustees is the only count at issue in this appeal.[2] That count relied upon the principle that if a settlor creates a spendthrift trust for his own benefit, it is void as to existing or future creditors and such creditors can reach the settlor's interest under the trust. Plaintiff alleged that as a creditor, it should be able to reach the assets of the trusts created by Sessions to satisfy its $1.5 million claim.

¶ 10    The circuit court entered summary judgment in plaintiff's favor on count III, finding that the Sessions Family Trust dated February 1, 1994, was void as to plaintiff's $1.5 million judgment against Sessions' estate and that the trust is liable for payment to plaintiff on the pledge. The court also made an express written finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Jan. 1, 2006) that there was no just reason for delaying enforcement or appeal or both of its order.

¶ 11    The trustees appealed, arguing that the common law principle relied upon by plaintiff "was supplanted by the Fraudulent Transfer Act [citation], which provides specific mechanisms for proving a transfer by a debtor was fraudulent." 2011 IL App (1st) 101136, ¶ 29. The appellate court agreed and reversed the circuit court's entry of summary judgment in favor of plaintiff. *Id.* ¶¶ 31, 35. In so doing, the appellate court first acknowledged Illinois case law, including *In re Marriage of Chapman*, 297 Ill. App. 3d 611, 620 (1998), and *Crane v. Illinois Merchants Trust Co.*, 238 Ill. App. 257 (1925), that holds that a trust created for the settlor's benefit is "void" with respect to the settlor's creditors, who may satisfy their claims out of the trust's assets. *Id.* ¶ 28. The appellate court held, however, that the common

---

[1]Plaintiff was later allowed to file a fourth count against the trustees under a statutory fraud theory.

[2]Counts I and IV alleged that asset transfers by Sessions to the trusts should be set aside under section 5 of the Fraudulent Transfer Act (740 ILCS 160/5 (West 2006)). Count II alleged that the trusts created by Sessions were contractually bound by the $1.5 million pledge, as they were one of Sessions' "successors and assigns."

-4-

law rule, as expressed in cases such as *Chapman* and *Crane*, could not exist in harmony with the Fraudulent Transfer Act. *Id.* ¶ 31.

¶ 12    Both plaintiff and the Attorney General filed petitions for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), which we allowed and consolidated for review.

¶ 13                                                 ANALYSIS

¶ 14    Before this court, both plaintiff and the Attorney General rely upon the common law rule that a person cannot settle his estate in trust for his own benefit so as to be free from liability for his debts. They contend that this common law trust rule and the Fraudulent Transfer Act operate in different spheres, and thus can exist in harmony with one another. Accordingly, they argue that the appellate court erred in reversing the circuit court's summary judgment order in favor of plaintiff on count III.

¶ 15    Summary judgment is proper when the pleadings, depositions, admissions and affidavits on file demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2006); *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 308-09 (2010). When an appeal before this court arises as a result of the appellate court's reversal of a trial court's order granting summary judgment, this court's review is *de novo*. *Thompson v. Gordon*, 241 Ill. 2d 428, 439 (2011).

¶ 16    We begin our analysis by noting the following well-settled principles that govern legislative abrogation of a common law rule. Common law rights and remedies remain in full force in this state unless expressly repealed by the legislature or modified by court decision. *Millennium Park Joint Venture*, 241 Ill. 2d at 305. Any legislative intent to abrogate the common law must be plainly and clearly stated, and such intent will not be presumed from ambiguous or questionable language. *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 518 (1997). Thus, Illinois courts have limited all manner of statutes in derogation of the common law to their express language, in order to effect the least—rather than the most—alteration in the common law. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 69 (2004) (collecting cases).

¶ 17    The implied repeal of the common law is not and has never been favored. See *People v. Spann*, 20 Ill. 2d 338, 341 (1960); *People ex rel. Nelson v. West Englewood Trust & Savings Bank*, 353 Ill. 451, 460 (1933). Thus, a statute that does not expressly abrogate the common law will be deemed to have done so only if that is what is "necessarily implied from what is expressed." *Acme Fireworks Corp. v. Bibb*, 6 Ill. 2d 112, 119 (1955). But in such cases, there must be an "irreconcilable repugnancy" between the statute and the common law right such that both cannot be carried into effect. *West Englewood*, 353 Ill. at 460. Where the common law rule in question provides greater protection than the statute at issue, but the rule is not inconsistent with the general purpose of the statute, "it is better to say that the law was intended to supplement or add to the security furnished by the rule of the common law rather than to say that it is repugnant to that rule." *West Englewood*, 353 Ill. at 461. Moreover, where a remedy is given by statute and there are no negative words or provisions rendering it exclusive, "it will be deemed to be cumulative only and not to take away prior remedies."

*Nottage v. Jeka*, 172 Ill. 2d 386, 392-93 (1996).

¶ 18    It is undisputed that the Fraudulent Transfer Act does not contain any provision that purports to expressly abrogate any portion of the common law. Quite to the contrary, section 11 of the Act contains a provision expressing a clear intent to preserve common law remedies: "Unless displaced by the provisions of this Act, the principles of law and equity, including *** *the law relating to *** fraud *** supplement its provisions.*" (Emphasis added.) 740 ILCS 160/11 (West 2006). The only question here, then, is whether there is a clear inconsistency between the two laws so that both cannot be carried into effect. Furthermore, it is not enough to justify the inference of abrogation from the simple fact that a subsequent statute covers some, or even all, of the questions covered by the common law; there "must be an irreconcilable repugnancy." *West Englewood*, 353 Ill. at 460.

¶ 19    Our reading of the Fraudulent Transfer Act and the common law rule at issue reveals no such irreconcilable inconsistency. Section 5(a) of the Act sets forth in relevant part a statutory cause of action for a fraudulent transfer as follows:

> "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they came due." 740 ILCS 160/5(a) (West 2006).

It has been stated that the general purpose of the Act is "to protect a debtor's unsecured creditors from unfair reductions in the debtor's estate to which creditors usually look to security." *In re Randy*, 189 B.R. 425 (Bankr. N.D. Ill. 1995).

¶ 20    The common law rule also has a general purpose of protecting creditors, but it addresses the specific situation where an interest is retained in a self-settled trust with a spendthrift provision. "Traditional law is that if a settlor creates a trust for the settlor's own benefit and inserts a spendthrift clause, the clause is void as to the then-existing and future creditors, and creditors can reach the settlor's interest under the trust."[3] Helene S. Shapo *et al*., Bogert's

---

[3]This rule has a 500-year lineage (see Erwin N. Griswold, *Spendthrift Trusts Created in Whole or in Part for the Benefit of the Settlor*, 44 Harv. L. Rev. 203, 204 (1930) (citing 3 Hen. VII, c. 4)), has been consistently applied as the law in Illinois for over 140 years (see, *e.g.*, *Guffin v. First National Bank of Morrison*, 74 Ill. 259 (1874); *Crane*, 238 Ill. App. 257 (1925); *In re Morris*, 151 B.R. 900 (C.D. Ill. 1993); *In re Marriage of Chapman*, 297 Ill. App. 3d 611 (1998); *Dexia Credit Local v. Rogan*, 624 F. Supp. 2d 970, 976 (N.D. Ill. 2009)), at least until the instant appellate court's decision, and remains the law in the vast majority of states throughout the nation (see Helene S.

Trusts and Trustees § 223, at 424-67 (3d ed. 2007). And the rule is "applicable although the transfer is not a fraudulent conveyance *** and it is immaterial that the settlor-beneficiary had no intention to defraud his creditors." Restatement (Second) of Trusts § 156 cmt. a (1959).

¶ 21    We believe that the common law rule supplements the statute in a consistent manner and that the appellate court therefore erred in holding to the contrary. Defendants do not maintain that the common law rule regarding self-settled spendthrift trust provisions affirmatively interferes with the operation of the Uniform Fraudulent Transfer Act by impeding in a given case the determination of whether the Act's requirements for declaring a transfer fraudulent have been met. Defendants instead claim that the common law rule is inconsistent with the Act in an indirect way. Specifically, they contend that the common law treats as fraudulent *per se* what the Act considers nonfraudulent, and therefore, the two cannot coexist.

¶ 22    We find defendants' contention unpersuasive. The common law and the statute are supplementary, not contradictory. Both laws have a general purpose of protecting creditors. But the common law focuses on the additional matter of the interest *retained* by the settlor of a specific kind of trust, and not simply the fraudulent *transfer* of an asset or the fraudulent *incurring* of a debt, as does the statute. Additionally, the Act and the common law rule each operate in some circumstances where the other does not, thus negating any inference that the common law rule would render the Act superfluous. The Act is effective, but the common law rule is not, in a much larger sphere, which includes both situations that do not involve trusts and in connection with transfers into trusts that are not for the settlor's benefit because they permit distributions only to other persons.

¶ 23    The appellate court found that "[i]f the legislature intended self-settled trusts to remain *per se* fraudulent under the common law, it would not have promulgated a statute defining the conditions required to prove a transfer was fraudulent." 2011 IL App (1st) 101136, ¶ 31. The problem with the appellate court's reasoning is twofold. First, section 11 of the Act specifically states that the common law "relating to *** fraud *** supplement[s] [the Act's] provisions" absent a clear intent of displacement by its provisions. 740 ILCS 160/11 (West 2006). Neither the case law nor plaintiff's complaint uses the term "fraudulent *per se*" to describe self-settled spendthrift trusts.[4] But to the extent that the term "fraudulent *per se*" can be accurately applied here, the proviso in section 11 indicates that any common law rule with respect to fraud should be read as supplementing the Act. We also do not find any displacement of the common law rule by the language in section 5 of the Act, as it is not a fraudulent *transfer* of funds that renders the trust void as to creditors under the common law,

Shapo *et al*., Bogert's Trusts and Trustees § 223 (3d ed. 2007); Restatement (Third) of Trusts § 58 cmt. e (2003)).

[4]*Cf. Crane v. Illinois Merchants Trust Co.*, 238 Ill. App. 257, 263 (1925) (the court described a conveyance into a self-settled trust as a continuing " 'fraud on creditors whether so intended or not' " (quoting *McKey v. Cochran*, 262 Ill. 376, 384-85 (1914))). We believe it more accurate to say that the common law rule operates irrespective of fraud. In other words, it recognizes that the creation of such a trust can be made without any fraudulent intent.

but rather it is the spendthrift provision in the self-settled trust and the settlor's *retention* of the benefits that renders the trust void as to creditors.

¶ 24 Second, it could be said that the policy behind the common law rule is not limited solely to deterring fraud, as it prevents the distinct injustice of allowing a person to use a trust as a vehicle to park his assets in a way that preserves his own ability to benefit from those assets, while keeping them outside the reach of his present and future creditors. If the law were otherwise, "it would make it possible for a person free from debt to place his property beyond the reach of creditors, and secure to himself a comfortable support during life, without regard to his subsequent business ventures, contracts, or losses." *Schenck v. Barnes*, 50 N.E. 967, 968 (N.Y. 1898). It is not possible that the legislature would have intended such a monumental shift in the law without clear, specific legislation to that effect.[5]

¶ 25 The appellate court concluded that count III could not survive because it did not allege, consistent with section 5 of the Fraudulent Transfer Act, "that decedent made a transfer to the trusts 'with actual intent to hinder, delay, or defraud' " plaintiff. 2011 IL App (1st) 101136, ¶ 32 (quoting 740 ILCS 160/5(a)(1) (West 2006)). Ironically, the very statutory language that the appellate court quotes and finds inconsistent with the common law rule has itself coexisted in complete harmony with the common law trust rule for centuries. Our state's law on fraudulent conveyances, like that of many jurisdictions in the United States, traces back to the Statute of 13 Elizabeth, enacted in the sixteenth century, which declared invalid " 'covinous and fraudulent' transfers designed to 'delay, hinder or defraud creditors and others.' " *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540-41 (1994) (quoting 13 Eliz., c. 5 (1570)). That statute itself codified the common law. *Campbell v. Whitson*, 68 Ill. 240, 243 (1873). Shortly after Illinois became a state, our legislature first codified the substance of the common law that invalidates fraudulent conveyances (1819 Ill. Laws 15, § 2). It then condensed it into section 4 of the 1874 Act to revise the law in relation to frauds and perjuries (Ill. Rev. Stat. 1874, ch. 59, § 4). That law remained in effect until January 1, 1990 (see Ill. Rev. Stat. 1989, ch. 59, ¶ 4), when the legislature repealed it and enacted the Uniform Fraudulent Transfer Act. See Pub. Act 86-814, § 13 (eff. Jan. 1, 1990) (adding 740 ILCS 160/5 and repealing Ill. Rev. Stat. 1987, ch. 59, ¶ 4). Thus, Illinois statutory law for well over 100 years before 1990 provided in relevant part that "[e]very *** transfer *** made with the intent to disturb, delay, hinder or defraud creditors *** shall be void as against such creditors." See Ill. Rev. Stat. 1987, ch. 59, ¶ 4; Ill. Rev. Stat. 1874, ch. 59, § 4. Similarly, from 1990 to the present, the Uniform Fraudulent Transfer Act has read in relevant part that "[a] transfer made *** by a debtor is fraudulent as to a creditor *** if the debtor made the transfer *** with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1) (West 2006). Given the longstanding coexistence of the common law trust rule and the statutory provisions against fraudulent conveyances that have

---

[5]See Restatement (Third) of Trusts § 60, Reporter's Notes on cmt. f (2003) (noting that Alaska and Delaware, motivated in part by a desire to attract trust business otherwise flowing to offshore jurisdictions, have adopted specific statutes permitting the creation of "asset protection trusts" into which a person may place assets for his own benefit free from the claims of future creditors).

remained essentially consistent in terms of the relevant language, we do not believe that the legislature intended to abrogate the common law rule by implication when it enacted the Uniform Fraudulent Transfer Act.

¶ 26　　Further support for our conclusion that the legislature intended to preserve rather than abrogate the common law rule with respect to self-settled spendthrift trusts is found in section 2-1403 of the Code of Civil Procedure (735 ILCS 5/2-1403 (West 2010)). That section provides for a general exclusion from postjudgment execution on property held in trust for the judgment debtor, but it expressly limits that exclusion to trusts that are not self-settled. See 735 ILCS 5/2-1403 (West 2010) ("No court *** shall order the satisfaction of a judgment out of any property held in trust for the judgment debtor if such trust has, in good faith, been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor."). The clear corollary is that Illinois law allows execution by a creditor against assets held in a self-settled trust and that the General Assembly thereby intended to preserve the common law trust rule. We also note that during nearly all of the many years that Illinois has had a fraudulent conveyance statute, it has also had a statute like current section 2-1403 of the Code that specifically withholds any protection from execution on assets held in trust for a judgment debtor who created or funded the trust. See 735 ILCS 5/2-1403 (West 2010); Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1403; Ill. Rev. Stat. 1977, ch. 110, ¶ 399; Ill. Rev. Stat. 1975, ch. 22, ¶ 49; 1871 Ill. Laws 339 (§ 49); 1845 Ill. Laws 97 (§ 36); *In re Marriage of Degener*, 119 Ill. App. 3d 1079, 1083 n.1 (1983). Yet, section 2-1403 and its predecessors have existed harmoniously alongside the Illinois statutes directed specifically at fraudulent conveyances without a hint of any inconsistency between them for more than a century. Nothing in the language of the Uniform Fraudulent Transfer Act convinces us that the legislature intended to change the status quo.

¶ 27　　In an alternative argument of sorts, defendants argue that the common law rule does not come into play because plaintiff did not become a judgment creditor in relation to Sessions before he died. Defendants claim that the common law rule regarding self-settled trusts applies only to the settlor's "lifetime interest" so that once the settlor dies, the rule does not permit a creditor to reach any trust assets that could have been, but were not, distributed to the settlor during his life. Citing section 156 of the Restatement (Second) of Trusts, defendants further contend that the common law rule operates only to negate the effect of the spendthrift clause and not the entire trust.

¶ 28　　Defendants' argument misapplies the legal principles it cites to the facts of the present case. We note that cases addressing similar arguments have held that the settlor's "interest" in a self-settled trust that his creditors may reach includes all income and principal that *could* have been distributed to the settlor, even when the trustee exercises complete discretion over such distributions. See Restatement (Second) of Trusts § 156(2) (1959); Restatement (Third) of Trusts § 60 cmt. f (2003). This must be distinguished from an interest that creditors may not reach: where assets contributed by the settlor are irrevocably deeded to the trust for the benefit of other beneficiaries, such as where income from the trust is payable to the settlor but principal may be distributed only to designated remaindermen after the settlor's death, in which case the settlor's "interest" includes only the trust income, and the trust principal is not subject to claims by the settlor's creditors. See *In re Brown*, 303 F.3d 1261, 1268-69

(11th Cir. 2002); Restatement (Third) of Trusts § 58 cmt. e (2003). The latter situation is clearly not present here, as the trust provisions gave the trustees (who could be replaced at will by the settlor and whose every material action was subject to the veto power of the settlor as "protector" of the trust) the power to distribute both *principal and income* to the settlor, in unlimited amounts, for his "maintenance, support, education, comfort, well-being, pleasure, desire or happiness."

¶ 29    Defendants rely chiefly on *Greenwich Trust Co. v. Tyson*, 27 A.2d 166 (Conn. 1942), to support their general claim that once a debtor dies, his creditor's no longer have any interest that can be reached in the debtor's self-settled trust.[6] But that case is distinguishable and does not support defendants' position. Unlike the assets in the present case (which the trustees were free to distribute to Sessions), the principal share subject to the relevant holding in *Greenwich* was not distributable to the settlor unless he lived for 20 more years after the trust was created, which he did not, and the trust further prohibited any alteration of that restriction. See *id.* at 170. The court found the situation to be one "where the settlor of the trust, after reserving to himself the income for life, creates vested indefeasible interests, to take effect at his death." *Id.* at 173. Here, in contrast, Sessions' interest extended to the entire trust, both principal and income. As noted above, all of the relevant authority uniformly rejects defendants' position under the circumstances presented here.

¶ 30    We also find unpersuasive defendants' position that creditor's rights under the common law do not extend to the assets that the trustees could have distributed to the settlor but did not distribute to him before he died. There is no conceptual difference—with respect to trust assets distributable to the settlor—between allowing the settlor to favor himself over his creditors and allowing him to favor his relatives and other heirs over his creditors. Just as the common law keeps the settlor from retaining the benefit of his assets while keeping them beyond his creditors' reach, it also requires the settlor to be " 'just before he is generous.' " *In re Estate of Kovalyshyn*, 343 A.2d 852, 859 (N.J., Hudson County Ct. 1975) (quoting *Merchants' & Miners' Transp. Co. v. Borland*, 31 A. 272, 274 (N.J. Ch. 1895)); see also 2 William Blackstone, Commentaries *512. Thus, we believe that if the settlor's interest in a self-settled trust is "void" as to the settlor's creditors, there is no sound reason to treat the creditors' rights as suddenly defeated the moment the settlor dies, thereby giving the commensurate economic benefit to the settlor's heirs. All of the relevant precedent that we have examined seems to support our conclusion. See, *e.g.*, *In re Morris*, 151 B.R. 900, 906-

---

[6]Defendants also rely on *dicta* in *In re Hall*, 22 B.R. 942, 944 (Bankr. M.D. Fla. 1982), which quotes, and uses out of context, the following unremarkable proposition from Bogert's treatise: "If the settlor creates a trust for the settlor for life, with a restraint on voluntary or involuntary alienation of this interest, and with a remainder in others at his death, his creditors can reach his life interest, but not the remainder." Helene S. Shapo *et al.*, Bogert's Trusts and Trustees § 223 (3d ed. 2007). Defendants confuse a "life estate," which is the right to use and *income* of property during a person's life (see *Keisling v. White*, 411 Ill. 493, 502 (1952)), with distributions during the life of a trust beneficiary to whom the trustee could distribute both income *and principal* (see Restatement (Second) of Trusts § 156(2) (1959)). *Hall* is also not on point because the debtor shared a cointerest in the property that was originally deeded to the cosettled trust.

07 (C.D. Ill. 1993); *Johnson v. Commercial Bank*, 588 P.2d 1096, 1100 (Or. 1978); *Deposit Guaranty National Bank v. Walter E. Heller & Co.*, 204 So. 2d 856, 862 (Miss. 1967); *Nolan v. Nolan*, 67 A. 52, 53 (Pa. 1907); see also *In re Estate of Nagel*, 580 N.W.2d 810, 812 (Iowa 1998); *State Street Bank & Trust Co. v. Reiser*, 389 N.E.2d 768, 771-72 (Mass. App. Ct. 1979); *Greenwich Trust Co. v. Tyson*, 27 A.2d 166 (Conn. 1942).[7]

¶ 31    In *Morris*, a bank became a judgment debtor of Doris Morris in 1987. In 1988, Doris received $80,000 in income she used to put in an irrevocable spendthrift trust where she was beneficiary, the trustee had discretion to pay her unlimited amounts of principal, and the remaining interest in the trust was to pass to Doris's heirs after her death. Doris filed bankruptcy in 1989, and then died one year later while that proceeding was still pending. Doris's heirs argued that the bankruptcy trustee could not "compel turnover of funds when the debtor has no present right to the funds *** [b]ecause Debtor died after she filed for bankruptcy." *Morris*, 151 B.R. at 906. The federal district court rejected that argument and found as follows:

> "[The heirs'] argument *** ignores the principle that if a settlor creates a spendthrift trust for her own benefit, it is void as to existing or future creditors, and they can reach her interests under the trust. [Citation.] Additionally, in the trust in the case at bar, the trustee had discretion to pay Debtor such amounts from the principal as necessary to maintain Debtor's standard of living. Because the trustee was entitled to apply the entire corpus for the support of Debtor, the entire corpus was subject to the claims of creditors. [Citations.] See *Farmers State Bank v. Janish*, 410 N.W.2d 188 (S.D. 1987) (Where a settlor is the beneficiary of the spendthrift trust, the spendthrift provision is ineffective against creditors who may reach the trust funds.). Thus, not only may Debtor's interest in the trust be reached, but also the interest [of the heir who received the remaining principle balance under the terms of the trust after Doris's death]." *Id.* at 906-07.

¶ 32    We find *Morris* to be almost exactly on point with the present case. The only difference is that the creditor in *Morris* became a judgment creditor prior to the settlor's death, but here, plaintiff did not obtain a judgment until after the settlor's death. Defendants argue that because no judgment was obtained while the settlor was alive and his pledge was not actually due until his death, plaintiff was not a "creditor" for purposes of the common law rule. We disagree with both aspects of defendants' argument.

¶ 33    The common law rule is clearly not limited only to claims brought against a trust by creditors who were "judgment creditors" of the settlor during his lifetime. See *Johnson*, 588 P.2d at 1100; *Deposit Guaranty*, 204 So. 2d at 862. In *Johnson*, the Supreme Court of Oregon decided a case where the settlor died before the creditor, a nurse, brought suit for

---

[7]There is a dearth of Illinois case law examining the question of how the common law trust rule applies with respect to a creditor's right to collect from trust assets where the settlor/debtor dies before a judgment recognizing the debt occurs. The non-Illinois cases cited here were either discussed by the parties in their briefs (*Morris*, *Johnson* and *Deposit Guaranty*) or were uncovered by our own research (*Nolan*, *Nagel* and *Reiser*).

payment on the home care she had rendered. The court first noted that although the trust was void as against the settlor's creditors only to the extent of his interest, his interest extended to the entire trust and so plaintiff, a creditor, could reach all the assets that he placed in the trust. *Johnson*, 588 P.2d at 1100. The court then addressed defendants' argument that plaintiff should lose because she brought suit after the settlor died and the remainders of the trust had vested. The court held that "creditors may reach such assets even after the settlor dies" because the placement of the funds into the trust is void as against existing and future creditors, and it is as if placement into the trust never occurred. *Id.* at 1100.

¶ 34        In *Deposit Guaranty*, the settlor also died before the judgment creditor came into existence, and the suit to reach trust assets was filed after the settlor's death. *Deposit Guaranty*, 204 So. 2d at 859. The Supreme Court of Mississippi held that a creditor's claim against the trust property is not defeated merely by the death of the debtor, and although the trust agreement is still good as far as the parties mentioned in it, the remainderman will take subject to the claim of the creditor, and payment of such claim from the assets of the trust will be enforced. *Id.* at 862-63. The court noted that if the rule were otherwise, "it would be possible for anyone to create a trust for his benefit, in which he retained the right to receive and use all income during his life, with remainder to another at the moment of death, free from claims of creditors, and then keep large credit accounts running and die leaving his debts unpaid, thus cheating his creditors." *Id.* at 862.

¶ 35        Nor is the common law rule limited to claims that were actionable only during the lifetime of the settlor as opposed to those accruing at the time of the death of the settlor. In *Nagel*, the Iowa Supreme Court addressed a situation where the two settlors of a trust were simultaneously killed in an accident that precipitated a tort suit brought by the estate of a third person that was also killed in the accident. *Nagel*, 580 N.W.2d at 811. The main question presented was whether the trusts' assets could be reached by the tort plaintiff even though the settlors' deaths rendered the trusts irrevocable. *Id.* In determining that the assets could be reached, the court rejected the defendant's contention that the debt must have arisen during the settlors' lifetimes in order for the assets to be reached. *Id.* at 812. The court noted that even though the tort claim was not reduced to judgment before the settlors deaths, "the facts precipitating it occurred during their lifetimes." *Id.*

¶ 36        Turning to the case before us, we find that Sessions was clearly a "debtor" of plaintiff during his lifetime and plaintiff in turn was clearly a "creditor" of plaintiff as those terms are commonly understood. A "debtor" is simply defined as "[o]ne who owes an obligation to another, esp. an obligation to pay money." Black's Law Dictionary 433 (8th ed. 2004). A "creditor" is "[o]ne to whom a debt is owed." Black's Law Dictionary 396 (8th ed. 2004). There is no question that Sessions incurred an obligation to pay plaintiff money, even if it was to be paid at the latest upon his death as a debt. Moreover, we note that, at the very least, the facts precipitating plaintiff's claim occurred during the lifetime of Sessions, and plaintiff could therefore recover against the trust assets. See *Nagel*, 580 N.W.2d at 812. Sessions clearly incurred the obligation to plaintiff during his lifetime and we have no trouble concluding that plaintiff was a creditor for purposes of the common law trust rule invoked in this case.

¶ 37                                          CONCLUSION

¶ 38        For the foregoing reasons, we hold that the Uniform Fraudulent Transfer Act did not
displace or abrogate the common law trust rule with respect to self-settled trusts. We also
conclude that under the undisputed facts of this case, plaintiff was a "creditor" of Sessions
for purposes of the common law rule. Accordingly, we reverse the judgment of the appellate
court, affirm the judgment of the circuit court, and remand the cause to the circuit court of
Cook County for further proceedings consistent with this opinion.


¶ 39        Appellate court judgment reversed.

¶ 40        Circuit court judgment affirmed.

¶ 41        Cause remanded.